**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **JOHN DOE,** | | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL CASE NO.** |
| **v.** | ) | |
| | ) | **JUDGE** |
| **UNIVERSITY HOSPITALS HEALTH SYSTEM, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

# PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff John Doe ("John" or "Plaintiff"), through undersigned counsel, respectfully moves this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order and preliminary injunction: (1) enjoining Defendant University Hospitals from keeping John on administrative leave from the Neurology residency program, or otherwise removing him from his clinical rotations and educational program prior to the conclusion of his Title IX process; (2) enjoining Defendant from subjecting John to a Title IX process that does not permit a live hearing and cross-examination; (3) enjoining Defendant from subjecting John to a Title IX process that is administered by Defendant and not an outside adjudicator; and (4) waiving security under Rule 65(c) or setting it in a nominal amount.

Immediate relief is necessary because the Title IX process that John presently faces deprives him of any chance at a fair process and outcome and violates federal law. The stakes for John are incredibly high as he risks the termination of his J-1 visa status that permits him to remain in the United States and, as a practical matter, the outcome of this process has the potential to end his medical career before this Court can reach the merits. The grounds for this Motion are set forth more fully in the attached Memorandum of Law, and are supported by the Verified Complaint filed contemporaneously herewith.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ Anna E. Bullock*

SUSAN C. STONE (OH 0064445)
KRISTINA W. SUPLER (OH 0080609)
ANNA E. BULLOCK (0100008)
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com; aeb@kjk.com
*Counsel for Plaintiff John Doe*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL CASE NO.** |
| | ) | |
| **v.** | ) | **JUDGE** |
| | ) | |
| **UNIVERSITY HOSPITALS HEALTH SYSTEM, INC.** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

## I. INTRODUCTION

Plaintiff John Doe ("John") is a second-year (PGY-2) resident in the Neurology residency program jointly administered by Case Western Reserve University (the "University") and Defendant University Hospitals (the "Hospital"). He is a citizen of Saudi Arabia, an international medical graduate, and is lawfully present in the United States pursuant to a J-1 visa through his residency. He has never been the subject of any disciplinary action in his program before the Title IX proceeding at issue here.

On July 1, 2026, Defendant found John responsible for unwelcome conduct and sexual assault and imposed the single most severe sanction available: dismissal from the residency

program. They did so after a proceeding that included no live hearing, no opportunity for John to cross-examine or even question his accuser or any witness, and no opportunity to review the surveillance footage and electronic messages on which the investigator and decision-maker relied. John was shown still images, but the videos themselves were withheld from him until after the finding issued. When he appealed, Defendant initially designated as the administrator of that appeal the very Deputy Title IX Coordinator who had signed the formal complaint against him. John objected, and Defendant assigned an outside adjudicator for his appeal. That outside adjudicator found merit to John's appeal and remanded the process to the investigation stage. Still, the appeal decision denies John a live hearing with cross-examination in violation of Title IX requirements. Additionally, over John's objection, Defendant is forcing John to remain on involuntary leave from his residency programming during the pendency of the Title IX case.

Nothing about the timing of Defendant's action is driven by safety. John continued participating in the residency program without incident for the three and a half months the investigation was pending. Defendant identified no safety or security concern that required his removal then, and none has arisen since. The only change is the issuance of a determination that is itself the product of a process that violated Defendant's own policy and the Title IX regulations it incorporates, John's successful appeal, and a remand to a process that is primed to repeat the errors of the first.

John asks only that the Court preserve the *status quo* while this case is litigated. He seeks an order enjoining Defendant from removing him from the residency program,

removing him from his clinical rotations, or barring him from the Hospital or the University pending resolution of this action. John also requests injunctive relief providing him with a neutral decisionmaker and a process that complies with the requirements of Title IX.

As more fully outlined herein, each of the four factors governing injunctive relief in the Sixth Circuit favors the relief John seeks, and Motion should be granted.

## II. STATEMENT OF FACTS

### A. The Parties and the Residency Program.

John[1] is a citizen of Saudi Arabia and an international medical graduate lawfully present in the United States pursuant to a J-1 visa. (Verified Compl. ¶ 28.) He is a PGY-2 resident in the Neurology residency program jointly administered by the University and Defendant University Hospitals (the "Hospital") at University Hospitals Cleveland Medical Center. (*Id.* ¶ 29.) The witness whose allegations led to the Title IX process against John, referred to herein as "Jane Doe,"[2] or "Jane," was a fourth-year co-resident of John in the same Neurology residency program. (*Id.* ¶ 33.) She has since graduated and no longer works at the Hospital. (*Id.* ¶ 34.) Prior to the proceeding at issue, John had never been the subject of any disciplinary action during his residency. (*Id.* ¶ 9.)

The Hospital's Title IX policy, Policy NDH-02, governed the proceeding. That policy expressly recognizes that "[f]ederal regulations provide for certain procedures that must be

---

[1] A pseudonym. Concurrently with this Motion and John's Verified Complaint, John submits a Motion to Proceed Under Pseudonym and for Protective Order.
[2] A pseudonym. *See* Motion to Proceed Under Pseudonym and for Protective Order.

used in the case of conduct that meets the definition of sexual harassment under Title IX," and represents that those procedures will be followed. (*Id.* ¶¶ 16, 118.) Defendant is a recipient of federal financial assistance. (*Id.* ¶¶ 11, 95.)

**B. The Initiation of the Formal Complaint.**

On February 26, 2026, John and Jane worked an overnight shift together in the Neurology department at University Hospitals Cleveland Medical Center. (*Id.* ¶ 36.) Jane never filed a formal Title IX complaint against John. (*Id.* ¶ 37.) Instead, on March 3, 2026, Jane met with Deputy Title IX Coordinator Deborah Marko Koeberer, and on March 4, 2026, Ms. Marko Koeberer, acting as Title IX Coordinator, signed and executed a formal Title IX complaint against John herself, alleging unwelcome conduct ("Allegation 1") and sexual assault ("Allegation 2"). (*Id.* ¶¶ 38-39.)

The complaint alleged that John made unwelcome sexual statements regarding Jane's appearance and engaged in non-consensual touching. (*Id.* ¶ 40.) John denied, and continues to deny, any physical contact with Jane. (*Id.* ¶ 52.) No witness was present during the alleged interaction at issue. (*Id.* ¶ 53.)

Throughout the three and a half months the investigation was pending, John continued to work in the residency program without incident, demonstrating that his removal is not necessary to address any safety or security concern. (*Id.* ¶ 89.)

**C. The Investigation.**

The Title IX office suspended its investigation at Jane's request from March 16, 2026 through April 10, 2026. (*Id.* ¶ 54.) At the outset of the investigation, John was instructed not

to speak with anyone about the matter, and he complied. (*Id.* ¶ 55.) Jane was subject to no comparable restriction. She spoke openly with co-residents and attending physicians about her allegations, spreading her account throughout the program before any determination was made and biasing program leadership, witnesses, the investigator, and the decision-maker against John. (*Id.* ¶ 56.) The investigator collected surveillance video footage showing John and Jane walking together to the on-call room, spending approximately twenty minutes inside, and then exiting and walking side by side to the Emergency Department. (*Id.* ¶ 57.)

Despite Jane's claim to the contrary, the footage shows no attempted physical contact by John and no distress or unusual demeanor by Jane. (*Id.* ¶ 58.) Indeed, John is looking at his phone for the majority of the walk on film. Before the determination issued, however, John was provided only still images of that footage. He was denied any opportunity to review the actual evidence upon which the investigator and decision-maker relied prior to the determination being issued. (*See id.* ¶ 59.) John mentioned video footage from the parking garage that would have shown John and Jane walking and talking amicably with one another as they walked out together after their shift on February 26, 2026. (*See id.* ¶ 47.) John also mentioned that he and Jane exchanged messages on a platform called Haiku that were friendly and ordinary exchanges after the alleged incident. (*See id.* ¶ 49.) Despite John mentioning the existence of this evidence, Defendant failed to gather or preserve it, resulting in it being destroyed. (*See id.* ¶¶ 48, 50.)

John was provided a draft investigation report on May 8, 2026, and timely submitted a written response. (*Id.* ¶ 60.) He was never afforded a live Title IX hearing. (*Id.* ¶ 61.) He was

denied an opportunity to question or cross-examine Jane or any adverse witness before a finding of responsibility was reached. (*Id.* ¶ 62.)

**D. The Written Determination and the Sanction of Dismissal.**

On July 1, 2026, Chief Compliance Officer and Title IX Decision-Maker LaVonne E. Pulliam issued a Written Determination finding John responsible on both Allegation 1 and Allegation 2 and imposing the sanction of dismissal from the residency program. (*Id.* ¶ 64.)

The Written Determination credited Jane's account as "consistent" despite material discrepancies. Her initial allegation placed the incident at approximately 3:30 a.m., while the video footage established that she and John entered the on-call room together at 5:13 a.m. (*Id.* ¶¶ 65-66.) Although Jane claimed during the investigation that John attempted to kiss her in the hallway after leaving the on-call room, the decision-maker dismissed the absence of any physical contact in the hallway and elevator footage as "not determinative." (*Id.* ¶¶ 67-68.) The decision-maker disregarded that Jane's own requested witness reported a materially different and more severe account than the allegations Jane ultimately advanced. (*Id.* ¶ 69.) Neither the investigator nor the decision-maker addressed that multiple witnesses observed John and Jane to be "completely fine," or that Jane had recently nominated John for Resident of the Month, describing him as "professional, kind, and hardworking." (*Id.* ¶ 70.)

The decision-maker further characterized John's offers of food to Jane and other colleagues (offers he extended to male and female residents alike) as evidence of intimidation, without any regard to the cultural context of such offers within Arab and Saudi custom. (*Id.* ¶ 71.)

**E. The Appeal and Remand.**

On July 15, 2026, John timely appealed the Written Determination on the grounds of procedural irregularity, new evidence not reasonably available at the time of the determination, and conflict of interest and bias, and requested that the sanction of dismissal be held in abeyance pending resolution. (*Id.* ¶ 73.)

The Deputy Title IX Coordinator who signed the formal complaint against John, Ms. Marko Koeberer, was also initially designated as the recipient and administrator of his appeal. (*Id.* ¶ 72.) The Title IX regulations Defendant's policy incorporates provide that the decision-maker on appeal "is not the same person" who served as the Title IX Coordinator in the matter, and require that every individual serving in these roles be free from conflicts of interest and bias. 34 C.F.R. §§ 106.45(b)(8)(iii)(B),(b)(1)(iii) (2020).

John objected to the assignment of Marko Koeberer as the appeal officer, and Defendant appointed an outside adjudicator. (*Id.* ¶ 74.)

On August 5, 2026, the outside adjudicator issued an Appeal Decision sustaining John's appeal in part and remanding the matter for further investigation, concluding that John "established one or more permissible grounds for appeal" and that "those issues materially affected the outcome." (*Id.* ¶ 75.)

The adjudicator identified two procedural deficiencies that materially affected the outcome. First, neither party was ever given the opportunity to review the actual evidence gathered in the investigation, including the surveillance footage; the investigator instead merely summarized that evidence in the report, in violation of the requirement that each

party be permitted to inspect and review the evidence before the investigation report is completed. (*Id.* ¶ 76.) Second, neither party was afforded any opportunity to submit written questions to the parties or witnesses before the determination issued, and neither party was even provided the final investigation report. (*Id.* ¶ 77.)

The adjudicator emphasized that the Written Determination "relied almost exclusively on credibility determinations, and the parties were not given the opportunity to test that credibility," invoking the Sixth Circuit's description of cross-examination as "'the greatest legal engine ever invented' for uncovering the truth." (citing *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018)). (Verified Compl., ¶ 77).

The remand accordingly requires that both parties be permitted to review all evidence in its entirety, that summaries of the evidence will not suffice, and that the parties be afforded the opportunity to submit written questions to the parties and witnesses, with reasonable follow-up, before a new determination issues. (*Id.* ¶ 78.)

Although it remanded the process to the investigation stage, the Appeal Decision denied John a live hearing with cross-examination. (*Id.* ¶ 79.) The adjudicator reasoned only that a medical center operating a residency program is not a "post-secondary institution" for which 34 C.F.R. § 106.45(b)(6)(i) requires a live hearing, relying on agency commentary accompanying the 2020 regulations. 85 Fed. Reg. 30026, 30446–30447. (*Id.* ¶ 79.) No statute, judicial decision, or provision of Defendant's own policy was cited for the denial. (*Id.* ¶ 79.)

On July 17, August 11, and August 20, 2026, John, through counsel, objected to the remand process and demanded a live hearing before a decision-maker with no prior

involvement, providing real-time cross-examination of Jane and every witness on whose statement the decision-maker intends to rely; production of all evidence gathered in the investigation rather than the investigator's summaries; a verbatim recording or transcript of the hearing; and a written determination containing express credibility findings. (*Id.* ¶¶ 81-82.) Defendant refused to provide a live hearing on remand and have limited John to written questions submitted through the decision-maker, who has not been identified. (*Id.* ¶¶ 81, 83.)

Over John's objection, Defendant has continued to hold John on involuntary administrative leave throughout the remand. (*Id.* ¶ 84.) Defendant has identified no safety or security concern justifying his removal, and the only reason they have offered for maintaining his leave is that the remand process "should be completed in the next twenty to thirty days." (*Id.* ¶¶ 86-87.) John did not have an opportunity to challenge the removal decision. (*Id.* ¶ 88). John worked in the residency program without incident for three and a half months while the investigation was pending; the only intervening event before his removal was the issuance of the very determination that Defendant's own appeal authority has since found defective and remanded. (*Id.* ¶ 89.)

### F. The Stakes for John Could Not be Higher.

John's dismissal will result in the loss of his J-1 visa status, his removal from the United States, and the effective end of his medical career. (*Id.* ¶ 92.) Placement in another program for an individual who has an open Title IX investigation or an adverse Title IX finding is practically impossible.

John is an international resident; PGY-3 neurology vacancies are exceedingly rare; the academic year has already begun and programs have set rotations and patient assignments; and any transfer requires credentialing and disclosure paperwork on which he would be obligated to disclose the existence of this Title IX investigation. If John were to seek a residency placement elsewhere, his J-1 sponsorship would also have to be transferred to a new sponsoring institution, a process that took approximately four months to complete initially. John risks deportation and the loss of his ability to remain in the United States in connection with the Title IX proceedings against him.

## III. STANDARD OF REVIEW

Plaintiff moves for a temporary restraining order and preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 65(a)–(b). In the Sixth Circuit, the same four-factor standard governs both forms of relief. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Thus, the Court can evaluate both the temporary restraining order and the preliminary injunction with the same analysis. *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 638 (E.D.Ky.2021). The decision to grant or deny injunctive relief falls solely within the discretion of the district court. *Id.*

The four factors used in evaluating temporary restraining orders and/or preliminary injunctions are: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable harm without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Id.* (internal citation omitted). "These factors are not

prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)(cleaned up)). The focus of a court ruling on a motion for temporary restraining order is "on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016) (cleaned up)).

Plaintiff need not prove his case in full at this stage. It is sufficient that he present "serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if [a TRO] is issued[.]" *Mariner Wealth Advisors, LLC v. Savvy Advisors, Inc.*, 2024 U.S. Dist. LEXIS 127767, *13 (citing *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2s 1261, 1263 (6th Cir. 1985)). Each one of the four factors are addressed below, in turn.

## IV. LAW AND ARGUMENT

Plaintiff satisfies each of the four factors governing the issuance of a temporary restraining order and preliminary injunction in this Circuit.

### A. Plaintiff Has Demonstrated a Strong Likelihood of Success on the Merits.

Plaintiff pleads four claims: gender discrimination under Title IX (Count I), retaliation under Title IX (Count II), breach of contract (Count III), and national origin discrimination under Title VI (Count IV). A likelihood of success on any one claim supports the requested relief. *Tennessee v. United States Dept. of Edn.*, 615 F. Supp. 3d 807, 837 (E.D.Tenn.2022)(citing

*Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 781 (6th Cir. 2003) ("If [the moving party] can show a likelihood of success on the merits of any of the claims, an injunction may issue, subject to consideration of the other factors."); *Planned Parenthood of Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, 2022 U.S. Dist. LEXIS 90243, 2022 WL 1597163, at *4 (W.D. Ky. May 19, 2022) (collecting cases) ("The moving party need only show a likelihood of success on the merits of one claim where there are multiple claims at issue in a complaint."); *Woods v. Lynch*, 2016 U.S. Dist. LEXIS 171343, 2016 WL 7192151, at *3 (W.D. Tenn. Dec. 12, 2016) (finding a likelihood of success on the merits of at least one of the moving party's claims was sufficient). John can demonstrate a likelihood of success on each of his claims.

As a threshold matter, John is entitled to the Title IX procedural protections afforded to students. The Sixth Circuit has confirmed that "every circuit to address the question agrees that medical residents receive the due process protections of students[.]" *Mares v. Mia. Valley Hosp.*, 96 F.4th 945, 952 (6th Cir. 2024) (collecting cases); *see also Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 558 (3d Cir. 2017) (holding Title IX applicable to a private educational institution affiliated with a hospital residency program). As a resident, John holds the status of both a student and employee. *Mares,* 96 F.4th at 952.

**1. Plaintiff Is Likely to Succeed on His Title IX Gender Discrimination Claim (Count I).**

Title IX prohibits sex discrimination in educational programs and activities receiving federal financial assistance. 20 U.S.C. § 1681(a). Defendant is a recipient of federal funding

and is subject to Title IX. The Sixth Circuit has "recognized at least four theories of Title IX liability in cases alleging gender bias in university disciplinary proceedings: (1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions." *Eid v. Wayne State Univ.*, 599 F. Supp. 3d 513, 537 (E.D.Mich.2022)(citing *Doe v. Univ. of Dayton*, 766 F. App'x 275, 280 (6th Cir. 2019)).

To present a Title IX claim under the erroneous outcome theory, a plaintiff must allege "facts sufficient to (1) 'cast some articulable doubt' on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a 'particularized causal connection between the flawed outcome and gender bias.'" *Id.* at 538. Here, the procedural irregularities in this proceeding cast articulable doubt on the accuracy of any outcome to be reached. Defendant denied John a live hearing, denied him an opportunity to cross-examine Jane or the witnesses against him, and denied him a meaningful opportunity to review the surveillance footage and electronic messages relied upon before an initial finding was reached.

The regulations incorporated by reference in Defendant's policy require an equal opportunity to inspect and review all evidence directly related to the allegations, "including the evidence upon which the recipient does not intend to rely…and inculpatory or exculpatory evidence," so that each party may meaningfully respond before the investigation concludes. 34 C.F.R. § 106.45(b)(5)(vi) (2020). They also require a live hearing with cross-examination conducted by each party's advisor of choice. *Id.* § 106.45(b)(6). Sixth Circuit authority expressly recognizes the requirement of a live hearing and cross examination, particularly where credibility is at stake. *Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir.2018). In

*Baum,* "because Doe alleged that the university did not provide an opportunity for cross-examination even though credibility was at stake in his case, he has pled facts sufficient to cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome." *Id.* (internal citations omitted). Where John has been denied a live hearing and cross-examination in both the initial process and on remand, he has cast articulable doubt on the accuracy of any outcome to be reached in this matter under *Baum,* satisfying the first element.

The Appeal Decision's denial of a live hearing further supports John's likelihood of success on the merits following his appeal. The Appeal Decision denied a hearing solely on the ground that a medical center operating a residency program is not a "post-secondary institution" under 34 C.F.R. § 106.45(b)(6)(i), relying on Federal Register commentary rather than any statute, judicial decision, or policy provision. 85 Fed. Reg. 30026, 30446–30447 (May 19, 2020). That commentary is not law.

After *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369, 412–13 (2024), this Court must exercise independent judgment in construing an ambiguous statute and need not defer to an agency's interpretation. The Sixth Circuit has applied that principle to decline deference to agency guidance at odds with a statute's text. *United States v. Bricker,* 135 F.4th 427, 440 (6th Cir. 2025); *Seldon v. Garland,* 120 F.4th 527, 531 (6th Cir. 2024). The post-secondary distinction on which the denial rests appears nowhere in 20 U.S.C. § 1681(a). The Sixth Circuit has further recognized that "every circuit to address the question agrees that medical residents receive the due process protections of students," *Mares v. Mia. Valley Hosp.,* 96 F.4th 945, 952 (6th Cir. 2024) (citing cases), and Defendant cannot invoke a Title IX grievance process that exists only

because residency is an educational program while denying John the protections that student status carries.

Unlike the academic dismissal at issue in *Mares*, moreover, John faces a disciplinary charge turning entirely on a contested credibility determination, the category the Sixth Circuit has identified as demanding the most process. *Id.* at 954 n.4 ("[s]tudents facing disciplinary actions are provided more process than students, like Mares, confronting an academic-based adverse action." (citing *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549 (6th Cir. 2013)). Even facing an academic-based adverse action, the plaintiff in *Mares* received written notice of the intended action, its justification, and her right to appeal; a meeting with the program director before the action proceeded; a hearing before a panel of three faculty members (one of whom she selected); the right at that hearing to be accompanied by an attorney and a faculty advocate, to present evidence, to call witnesses, and to rebut the program's reasoning for the adverse action; a written panel recommendation to the medical school Dean and to the chief executive of the employing institution; and a final appeal to the Provost. *Id.* at 953-55. Even on Defendant's own reading of the regulations, 34 C.F.R. § 106.45(b)(6)(ii) permits a recipient that is not a post-secondary institution to provide a hearing, and nothing in Defendants' policy forbids one. John is therefore likely to establish that the process Defendants afforded him, and the process they propose on remand, violates Title IX.

As to the second element, John can demonstrate that gender bias was a motivating factor in the erroneous outcome reached against him in the first iteration of this matter. The

decision-maker credited Jane's account as "consistent" notwithstanding that her initial allegation placed the incident at approximately 3:30 a.m. while the footage established a 5:13 a.m. entry, and notwithstanding her own witness's materially different and more severe account of the interaction alleged. At the same time, the decision-maker declined to credit John's unwavering denial of any physical contact, dismissed exculpatory footage as "not determinative," and ignored both the observations of witnesses who found the two to be "completely fine" and Jane's own recent nomination of John for Resident of the Month. This analysis represents a differing application of credibility standards along gender lines, which has been found to be evidence of gender bias in Title IX proceedings in the Sixth Circuit. *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir.2018)(finding inference of gender bias supported by affording credit to all female witnesses while rejecting all male witnesses).

Third, external pressure and institutional context involving Case Western Reserve University (the "University"), which administers the residency program with Defendant, reinforce that inference. In August 2023, the United States Department of Justice announced an agreement with the University resolving a federal Title IX investigation, which had concluded that the University failed to respond appropriately to a "well-known climate of sexual harassment." (Verified Compl. ¶¶ 22-23.) The University remains subject to that agreement's compliance obligations and continuing federal monitoring, and funds a Women's Center to support students affected by sex discrimination while offering no analogous support to a center for male students. (*Id.* ¶¶ 24-25.) The Sixth Circuit has cited external pressure on an institution, including federal investigations and resolution

agreements, as probative of gender bias. *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir.2018)(assessing a government investigation of defendant's Title IX processes as probative of gender bias).

In the alternative, John alleges that Defendant selectively enforced its Title IX policies, pursuing and adjudicating the complaint against John, a male respondent, with greater speed and severity than comparable complaints along lines of gender, and imposing the most severe sanction available against John.

The Sixth Circuit has "held that '*patterns* of decision-making' in the university's cases can show the requisite connection between outcome and sex" to support an erroneous outcome claim. *See Doe v. Oberlin College*, 963 F.3d 580, 586 (6th Cir.2020)(citing *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018)). A university that "categorically discriminates against men or women in sexual-assault proceedings" may not "escape liability in erroneous-outcome cases." *See id.* Here, John has alleged differential patterns of decision-making in both his Title IX process and in Defendant's Title IX processes generally that support an inference of anti-male bias. (Verified Compl. ¶¶ 96-97.) Thus, he is likely to succeed on his Title IX erroneous outcome claim.

#### 2. Plaintiff Is Likely to Succeed on His Title IX Retaliation Claim (Count II).

John engaged in protected activity under Title IX by participating in the Title IX process and by filing an appeal of the determination against him. Defendant responded by removing John from the residency program by forcing him to accept an administrative leave

over his objection prior to a final finding of responsibility.. To establish a prima facie case for this claim, a plaintiff "must show that he engaged in 'protected activity'; that [the institution] knew about that activity; that he suffered an 'adverse school-related action'; and that 'a causal connection exists between the protected activity and the adverse action.'" *Porter v. Sergent*, 6th Cir. No. 23-5944, 2024 U.S. App. LEXIS 27681, at *9 (Oct. 29, 2024) (quoting *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020)). "To determine whether a challenged retaliatory action is 'adverse' for Title IX purposes, [courts] ask whether the action would dissuade a reasonable person from engaging in the protected activity." *Doe v. Univ. of Kentucky*, 111 F.4th 705, 716 (6th Cir.2024)(internal citation omitted). "[T]his standard 'is not onerous.'" *Id.* (citing *Henry v. Abbott Lab'ys*, 651 F. App'x 494, 504 (6th Cir. 2016) (citing cases)). Forcing John to be on administrative leave denies him educational benefits and is a materially adverse action. It would dissuade a reasonable student from availing himself of the Title IX and Title IX appeal processes. Here, John is losing out on critical instruction and clinical experience in his second year of residency; time he cannot get back. Furthermore, John's removal creates the false impression among his colleagues that he has been determined either 1) to be a threat sufficient to justify this removal or 2) that John has been found responsible for a Title IX violation. Neither is true. Defendant undertook no individualized safety analysis of John and is prohibited from imposing any disciplinary sanction under Title IX until the conclusion of the grievance process after a determination has been reached.

Title IX jurisprudence in this Circuit has borrowed from Title VII standards in assessing retaliation claims. *Doe v. Univ. of Kentucky*, 111 F.4th 705, 716 (6th Cir.2024)(applying

Title VII caselaw to retaliation "in the Title IX context, with the caveat that the adverse action must be 'school-related.'"). In the employment context, "temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008). The temporal sequence in this case supports causation: John was permitted to work without incident for three and a half months while the investigation was pending, and Defendant placed John on administrative leave only after he invoked the appeal process, identified the conflict of interest in its administration, and prevailed. John is likely to succeed in his claim of Title IX retaliation.

### 3. Plaintiff Is Likely to Succeed on His Breach of Contract Claim (Count III).

Under Ohio law, the relationship between a student and a private university is contractual, and the institution's published policies form part of that contract. *Marquette v. Ohio Univ.*, Ct. of Cl. No. 2024-00676AD, 2025-Ohio-3218, ¶ 14 (citing *Bleicher v. Univ. of Cincinnati College of Med.*, 14 Ohio App.3d 302, 308, 604 N.E.2d 783 (10th Dist. 1992); *Embrey v. Central State Univ.*, 1991 Ohio App. LEXIS 4886 (10th Dist. Oct. 8, 1991); *Smith v. Ohio State Univ.*, 53 Ohio Misc.2d 11, 13, 557 N.E.2d 857 (Ct. of Cl. 1990)). Policy NDH-02 was incorporated into the contractual relationship between John and Defendant, and expressly incorporates the procedural protections required by the applicable Title IX regulations.

Defendant breached those obligations when it: (a) reached a determination of responsibility without holding a live hearing in the first instance; (b) denied John any

opportunity to question or cross-examine Jane or adverse witnesses; (c) denied John a meaningful opportunity to review the surveillance footage and electronic messages before a finding was reached; (d) imposed the sanction of dismissal based on a proceeding that departed from the promised procedures in each of these respects; (f) upon John's successful appeal and remand of the process to the investigation stage, placed John on administrative leave in violation of Title IX requirements; and (g) are continuing to subject John to a deficient Title IX process denying him a hearing before a neutral adjudicator. (*See* Verified Compl. ¶¶ 61-63, 85-88.) John performed his own obligations by participating in the residency program and abiding by Defendant's policies. (*Id.* ¶ 126.)

Against a private institution, a student must produce "evidence of a violated contractual right or evidence that the school clearly abused its discretion in enforcing its policies and regulations." *Cook v. Kudlacz*, 2012-Ohio-2999, ¶ 21 (7th Dist.)(internal citation omitted). Here, Defendant clearly violated the contractual obligation to adhere to Title IX procedures in the adjudication of the complaint against John where the Title IX regulations are baked into the policy. Defendant's own appeal authority has confirmed this. The August 5, 2026 Appeal Decision found that Defendant failed to give the parties any opportunity to review the actual evidence gathered in the investigation and failed to afford the parties any opportunity to submit written questions to test credibility before the determination issued, and that these deficiencies materially affected the outcome. (Verified Compl. ¶¶ 76-77.) Those findings establish, by Defendant's own admission, that the adjudication departed from the procedures Policy NDH-02 promised, and Defendant has compounded that breach on

remand by refusing to provide the live hearing that the credibility-driven nature of this matter requires. (*Id.* ¶ 78.)

Defendant has separately breached its obligation to apply the presumption of non-responsibility that Policy NDH-02 and the Title IX regulations require until the grievance process concludes. 34 C.F.R. § 106.45(b)(1)(iv) (2020). Because a medical resident is properly regarded as a student under the authorities governing his status, *see Mares v. Mia. Valley Hosp.*, 96 F.4th 945, 952 (6th Cir. 2024); *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 558 (3d Cir. 2017), the provision governing his removal is 34 C.F.R. § 106.44(c), which permits removal of a student respondent only where the recipient conducts an individualized safety and risk analysis, determines that an immediate threat to physical health or safety justifies removal, and affords the respondent notice and an opportunity to challenge the removal. Defendant did none of these things. They instead rely on 34 C.F.R. § 106.44(d), which applies only to a "non-student employee respondent," and offer no justification for John's continued leave beyond their unsupported conjecture that the remand "should be completed in the next twenty to thirty days." (Verified Compl. ¶¶ 85-87.) That John worked without incident for three and a half months while the investigation was pending, and was removed only upon issuance of the determination that has since been found defective and remanded, confirms that his continued leave is punitive rather than protective. (*Id.* ¶ 89.)

Every contract in Ohio carries an implied covenant of good faith and fair dealing that obligates each party to act honestly and to refrain from conduct depriving the other of the benefit of the bargain. Defendant's decision to proceed with blatant violations of both Title

IX and its own policies over John's objection evidences bad faith in the violations that have occurred and are continuing in John's Title IX process.

#### 4. Plaintiff Is Likely to Succeed on His Title VI National Origin Discrimination Claim (Count IV).

Title VI provides that no person shall, on the ground of national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. John is a Saudi Arabian national. Defendant's initial adjudicator characterized John's offers of food to colleagues (offers extended to male and female residents alike) as evidence of intimidation and inappropriate conduct, without any consideration of their cultural context. In Arab and Saudi custom, offers of food are ordinary expressions of generosity, and repeated offers met with polite refusals are unremarkable.

In the Sixth Circuit, to "establish a claim, under Title VI, a plaintiff must demonstrate that the 'program or activity' receives federal financial assistance, … , and that there is a nexus between the 'program or activity' and the discriminatory conduct." *D. J. Miller & Assocs. v. Ohio Dept. of Adm. Servs.*, 115 F.Supp.2d 872, 878 (S.D.Ohio 2000)(citing *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996); *David K. v. Lane*, 839 F.2d 1265, 1275-76 (7th Cir. 1988)). The plaintiff also must demonstrate intentional discrimination. *Id.* Here, Defendant receives federal financial assistance, satisfying the first element. (Verified Compl. ¶¶ 11, 113.) John was judged and ultimately sanctioned, in part, due to credibility findings that were based on his cultural custom which is a proxy for his national origin. Thus, the

decision to dismiss him in the original Title IX process was "motivated by" a protected characteristic, and that it was a "determining factor in the exclusion[.]" *D. J. Miller & Assocs. v. Ohio Dept. of Adm. Servs.*, 115 F.Supp.2d 872, 878 (S.D.Ohio 2000). Plaintiff is likely to succeed on the merits of his Title VI claim.

### B. Second Factor: Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief.

"An irreparable injury is an injury that 'cannot be undone through monetary remedies' and, as a general rule, 'a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial.'" *Romantics v. Activision Publishing, Inc.*, 532 F.Supp.2d 884, 890 (E.D.Mich.2008)(citing *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995)). The harm to the Plaintiff "must be 'actual and imminent,' and not merely remote or speculative." *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 680 (E.D. Mich. 1995); aff'd 91 F.3d 143 (6th Cir. 1996); *Center for Biological Diversity v. Lueckel,* 248 F. Supp. 2d 660, 669 (W.D. Mich. 2002) ("to justify injunctive relief, there must be a 'substantial threat of impending injury'"), aff'd 417 F.3d 532 (6th Cir. 2005). "[I]t is within the trial court's discretion to make a reasonable determination whether an adequate remedy at law is available or whether irreparable injury will result to the party seeking an injunction if no injunction is issued." *Total Quality Logistics,* 2022-Ohio-1802, ¶ 28 (12th Dist.)(internal citation omitted).

Sixth Circuit authority supports the proposition that loss of immigration status or the threat of removal constitutes irreparable harm. *Cruz v. Mullin*, E.D.Mich. No. 25-cv-13347,

2026 U.S. Dist. LEXIS 104772, at *14 (May 12, 2026)(holding, "[t]he loss of the statutory opportunity to apply for asylum is not a harm compensable in damages[.]"). Here, the harm John faces is immediate, concrete, and beyond the power of a damages award to repair. If John is subjected to the Title IX process Defendant intends to provide and he is dismissed, his dismissal terminates the J-1 visa sponsorship that permits John to remain lawfully in the United States. Loss of lawful status and removal from the country cannot be undone by a later judgment.

Second, an erroneous finding against John ends John's medical career as a practical matter. He is an international medical resident; PGY-3 neurology vacancies are exceedingly rare; the academic year has begun and programs have already set rotations and patient assignments; and any transfer application requires credentialing and disclosure paperwork on which he must truthfully disclose the existence of this Title IX investigation, regardless of merit. Together, these obstacles make placement in another program nearly impossible. The Southern District of Ohio has recognized "injuries, such as lost educational opportunities and the inability to pursue a vocation, [as] sufficient to establish the irreparable injury to warrant preliminary injunctive relief[.]" *Berger v. Natl. Bd. of Med. Examiners*, S.D.Ohio No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666, at *80 (Aug. 27, 2019). Just so, for John, the interruption or termination of his professional training (currently ongoing with Defendant's improper imposition of administrative leave), and the attendant loss of educational and career opportunities, constitutes irreparable harm weighing in favor of an injunction.

Third, "[m]atters concerning reputation can constitute irreparable harm for which there is no adequate remedy at law." *DK Prods. v. Miller*, 2009-Ohio-436, ¶ 13 (12th Dist.) (citing *Fischer Dev. Co. v. Union Twp*. (May 1, 2000), Clermont App. No. CA99-10-100, 2000 Ohio App. LEXIS 1873 at *16; *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health* (1997), 124 Ohio App.3d 308, 706 N.E.2d 336). Here, the reputational injury from a recorded erroneous finding of sexual assault and John's improper removal from the residency program (legitimizing the erroneous initial finding against John prior to a final determination) is not compensable in damages.

### C. Third Factor: Issuance of the Requested Relief Will Not Cause Substantial Harm to Others.

The relief John seeks preserves the *status quo* in requiring John to be permitted to return to his residency program as he did during the pendency of his initial investigation and to require Defendant to adhere to applicable Title IX requirements and provide John with a fair, live hearing. In other words, John asks the Court to leave in place the arrangement under which the parties operated for three and a half months while the investigation was pending, during which John worked in the program without incident, and Defendant identified no safety or security concern warranting his removal. Indeed, Jane did not work with John during the pendency of the original proceeding, and Jane has since graduated and is at another institution now. (*See* Verified Compl. ¶¶ 34, 45.)

Defendant suffers no cognizable harm from being required to permit John to return and to hold a live hearing before a neutral decisionmaker. Nor would Jane be harmed: all

involved benefit from a fair process. Defendant retains every supportive and protective measure available under its policy, including schedule and rotation adjustments and no-contact directives, and Plaintiff does not ask the Court to disturb any such measure. An institution's ability to impose interim measures mitigates any harm from injunctive relief. *Sellers v. Univ. of Rio Grande*, 838 F.Supp.2d 677, 688 (S.D.Ohio 2012 (recognizing the ability of the defendant "university to protect any patient's interest by limiting [plaintiff's] direct interactions with them" in a scenario in which a student pursued a TRO to address an alleged denial of ADA accommodations delayed a nursing student's competency evaluation). By contrast, the harm to John absent relief is total and irreversible.

**D. Fourth Factor: The Public Interest Favors Injunctive Relief.**

The public interest lies in the faithful enforcement of Title IX and Title VI and in ensuring that federally funded institutions afford the procedures those statutes and their implementing regulations require.

The public has an interest in the integrity and fairness of institutional adjudications such as John's; that credibility not be assessed asymmetrically along lines of gender or national origin; that a respondent be permitted to see the evidence used against him before he is found responsible on it; and that the parties in a Title IX proceeding are entitled to a live hearing with cross-examination, particularly in cases in which credibility is paramount. "Congress [has] expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit 'does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest importance.'" *Riverside v. Rivera*, 477 U.S. 561,

575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)(quoting *Newman* v. *Piggie Park Enterprises, Inc*., 390 U.S. 400, 402 (1968)). Enjoining John's unlawful exclusion from his residency program produced by a process lacking mandated Title IX and Title VI protections vindicates rather than disserves the public interest.

Finally, there is a public interest in the continuity of patient care and in the training of physicians. "Courts in the Sixth Circuit have held that public policy supports an injunction when there would be a disruption to medical services or a patient's continuity of care." *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, 599 F. Supp. 3d 497, 509 (W.D.Ky.2022)(citing*, e.g., Hagan v. Vision Serv. Plan*, No. 05-72517, 2005 U.S. Dist. LEXIS 34192, 2005 WL 3447882, at *10 (E.D. Mich. Dec. 15, 2005); *Galper v. U.S. Shoe Corp*., 815 F. Supp. 1037, 1044 (E.D. Mich. 1993)). Removing a resident mid-year from one of the nation's leading neurology programs, on the basis of a proceeding of doubtful validity, serves neither.

**E. Security Under Rule 65(c) Should Be Waived or Set in a Nominal Amount.**

Rule 65(c) permits the Court to set security in such sum as it considers proper, and the amount, including whether to require any bond at all, rests in the Court's discretion. "[T]he rule in [the Sixth] [C]ircuit has long been that the district court possesses discretion over *whether* to require the posting of security." *Appalachian Regional Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir.2013)(emphasis in original)(quoting *Moltan Co. v. Eagle-Picher Indus., Inc*., 55 F.3d 1171, 1176 (6th Cir. 1995) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978)). A court errs when it "fail[s] to…expressly

consider[] the question of requiring a bond" when the issue has been raised. *Id.* (citing *Roth*, 583 F.2d at 539; *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 953 (6th Cir. 2007).Fed. R. Civ. P. 65(c). Because the requested relief in this case preserves the status quo and imposes no monetary cost on Defendants, and because John is a resident physician of limited means facing the loss of his position and visa status, Plaintiff respectfully requests that security be waived or set in a nominal amount.

## V. CONCLUSION

For the foregoing reasons, Plaintiff John Doe respectfully requests that this Court grant his Motion and enter a temporary restraining order and preliminary injunction:

(1) enjoining Defendant from removing John from the Neurology residency program, or otherwise removing him from his clinical rotations and educational program prior to the final decision in his Title IX proceedings;

(2) requiring Defendant to provide John with a Title IX process compliant with Title IX regulations, including requirements to permit live cross-examination of all witnesses by an advisor of his choice;

(3) requiring Defendant to appoint an outside adjudicator to administer the remainder of the Title IX process involving John;

(4) waiving security under Rule 65(c) or setting it in a nominal amount; and

(5) granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**
*/s/ Anna E. Bullock*

SUSAN C. STONE (0064445)
KRISTINA W. SUPLER (0080609)
ANNA E. BULLOCK (0100008)
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com; aeb@kjk.com

*Counsel for Plaintiff John Doe*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of September, 2026, I caused a copy of the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction to be electronically filed with the Clerk of the United States District Court for the Northern District of Ohio using the CM/ECF system, which will send notification of such filing to all parties that have appeared in this action. Further, by email consent, this pleading was served upon counsel for University Hospitals Health System, Inc. via email:

David A. Campbell
Gordon Rees Scully Mansukhani
127 Public Square, Ste. 5130,
Cleveland, OH, 44114
dcampbell@grsm.com

*/s/ Anna E. Bullock*
ANNA E. BULLOCK (0100008)