**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL CASE NO. 1:26-CV-02126** |
| | ) | |
| **v.** | ) | **JUDGE CHARLES ESQUE FLEMING** |
| | ) | |
| **UNIVERSITY HOSPITALS CLEVLAND** | ) | |
| **MEDICAL CENTER** | ) | |
| C T CORPORATION SYSTEM | ) | |
| 4400 EASTON CMNS STE 125 | ) | |
| COLUMBUS OH 43219 | ) | |
| **Defendant.** | | |

---

**VERIFIED AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

---

Plaintiff John Doe[1] ("John" or "Plaintiff") through undersigned counsel, files this Verified Complaint pursuant to Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), and Title VI of the Civil Rights Act of 1964 42 U.S.C. § 2000d, against defendant University Hospitals (the "Hospital") seeking injunctive, declaratory, compensatory, and other further relief, and alleges as follows:

## JURISDICTION AND VENUE

1. This action arises under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") and Title VI of the Civil Rights Act of 1964 42 U.S.C. § 2000d.

[1]John has filed a pending Motion to Proceed Under Pseudonym and for Protective Order.

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

3. The amount in controversy in this action exceeds the sum of $75,000.

4. This Court has personal jurisdiction over the Defendant because it conducts business within the state of Ohio.

5. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the Northern District of Ohio.

## PARTIES

6. John is an international medical graduate ("IMG") on a J-1 visa.

7. John currently resides in Ohio.

8. John is a second-year (PGY-2) resident in the Neurology residency program through Case Western Reserve University at University Hospitals.

9. During his time as a medical resident, John has never had any disciplinary actions against him prior to the Title IX proceeding at issue.

10. The Hospital has multiple centers, including the relevant University Hospitals Cleveland Medical Center, located within this District.

11. Defendant is a recipient of federal funding.

## THE HOSPITAL'S RELATIONSHIP WITH CASE WESTERN RESERVE UNIVERSITY AND THE NEUROLOGY RESIDENCY PROGRAM

12. University Hospitals Cleveland Medical Center has been affiliated with Case Western Reserve University (the "University") and its School of Medicine since the late 1800s.[2]

13. University Hospitals 2025 Annual Report lists that its education programs include 1,179 residents and fellows among 116 residency training programs.[3]

14. The Hospital provides medical education through the Case Western Reserve University/University Hospitals Cleveland Medical Center Neurology Residency Program (the "Neurology Residency Program").

15. The Neurology Residency Program is accredited by the accreditation Council for Graduate Medical Education (program number 1803821089).

16. The Hospital's Notice of Nondiscrimination Policy, posted on its Neurology Residency Program Website, promises residents, "in collaboration with Case Western Reserve University" that it "admits students of any race, religion, age, sex, color, disability, sexual orientation, and national or ethnic origin to all the rights and privileges, programs, and activities generally accorded or made available to students at the University. It does not discriminate on the basis of race, religion, age, sex, color, disability, sexual orientation, or

[2] https://www.uhhospitals.org/about-uh
[3] University Hospitals 2025 Annual report, p. 7.

national or ethnic origin in administering its educational policies, admission policies, scholarship and loan programs, and athletic or other University-administered programs."[4]

**BACKGROUND PRESSURE AGAINST DEFENDANTS TO ACT WITH ANTI-MALE BIAS**

17. Defendant has faced pressure to act with bias against male respondents in Title IX proceedings and to appear harsh on all claims of sexual harassment brought by females against males.

18. Beginning in 2011, educational institutions around the country came under heavy pressure from the federal government to appear tough at all costs on claims of sexual assault, especially those brought by women against men. That pressure was exerted primarily through the enforcement of a "Dear Colleague Letter" (DCL) published by the Education Department's Office for Civil Rights (OCR) in April of that year, which addressed the ways schools were required to aggressively enforce Title IX and address claims of sexual assault occurring in institutions of higher education.

19. Enforcement of the DCL relied upon threats by OCR's leadership to revoke federal funding from institutions that failed to comply.

20. The DCL has been recognized by federal courts to have exerted pressure on institutions, like Defendant, to respond aggressively to accusations of sexual and dating violence brought by females against males.

[4] https://www.uhhospitals.org/medical-education/neurology-medical-education/neurology-residency/how-to-apply

21. The pressure to disproportionately find male respondents accused of sexual misconduct by female complainants responsible was felt by Defendant.

22. In August 2023, the United States Department of Justice announced an agreement with Defendant's affiliate and partner in administering the Neurology Residency Program, the University, resolving a federal Title IX investigation into the University's response to student-on-student and employee-on-student sexual harassment (the "DOJ Agreement").

23. The investigation, initiated in February 2021, concluded that the University failed to respond appropriately to a "well-known climate of sexual harassment."

24. The University remains under the compliance obligations of the DOJ Agreement, which include conducting outreach and analyzing trends, delivering annual training, and reforming policies with continuing federal monitoring.

25. The University's agreement requires the University to fund the Women's Center to support students affected by sex discrimination while offering no similar support for male students affected by discrimination.

26. The University's agreement precipitated disproportionate efforts to find respondents, who, upon information and belief, are overwhelmingly male, responsible for allegations of sexual misconduct brought by complainants, who are overwhelmingly female.

27. This backdrop of pressure to act with anti-male discriminatory animus came to bear on John's Title IX process conducted by Defendant.

## FACTUAL BACKGROUND

28. Plaintiff John Doe is a citizen of Saudi Arabia lawfully present in the United States pursuant to a J-1 visa and is an international medical resident.

29. Plaintiff is a second-year (PGY-2) resident in the Neurology Residency Program jointly administered by the University and the Hospital at University Hospitals Cleveland Medical Center.

30. Because John is an international medical graduate ("IMG") student, his path to residency match was particularly challenging.

31. John applied to residency in two cycles.

32. He applied to approximately one hundred forty (140) residency programs and secured few interviews before matching in Defendant's Neurology Residency Program.

33. Jane Doe[5] ("Jane"), at the time relevant to this complaint, was a fourth-year co-resident of Plaintiff in the same Neurology residency program.

34. Jane has since graduated and no longer works in the Hospital.

35. Jane is the witness whose allegations gave rise to the Title IX proceeding at issue.

36. On February 26, 2026, Plaintiff and Jane worked an overnight shift together in the Neurology department at University Hospitals Cleveland Medical Center.

37. Jane did not file a formal Title IX complaint against John.

---

[5] A pseudonym. *See* Motion to Proceed Under Pseudonym and for Protective Order filed concurrently with this Complaint.

38. On March 3, 2026, Jane met with Defendant's Deputy Title IX Coordinator, Deborah Marko Koeberer.

39. On March 4, 2026, Ms. Marko Koeberer, acting as Title IX Coordinator, signed and executed a formal Title IX complaint against John alleging unwelcome conduct ("Allegation 1") and sexual assault ("Allegation 2") against Jane.

40. The complaint alleged that on February 26, 2026, John sexually harassed and/or sexually assaulted Jane through unwelcome sexual statements regarding her appearance and non-consensual touching.

41. During the process, Jane requested information about informal resolution of the Title IX complaint.

42. John requested informal resolution of the Title IX complaint against him.

43. Defendant stated that informal resolution of the Title IX complaint was not an option.

44. Jane was initially told that there would be a live hearing on the Title IX complaint, but was later told that there would be no live hearing.

45. Jane was told that she would not have to work with John in connection with supportive measures to be provided to her without placing either Jane or John on administrative leave.

46. On March 11, 2026, John was interviewed for the first time.

47. During John's initial interview, he mentioned that he and Jane had walked together to the parking garage on February 26, 2026 and that they had ordinary and friendly interactions during that walk.

48. Defendant failed to obtain or preserve the video footage showing these interactions immediately after the allegations.

49. During John's initial interview, he also mentioned that he and Jane shared positive, friendly messages through Defendant's Haiku messaging platform between each other on February 26, 2026.

50. Defendant failed to obtain or preserve those messages that would have supported John's account.

51. Throughout the three and a half months that the initial investigation was pending, Plaintiff continued to participate in the residency program without incident, demonstrating that his removal is not necessary to address any safety or security concern.

52. John denied making any sexual statements to Jane or having any physical contact with Jane.

53. No witness was present during the alleged incident between John and Jane on February 26, 2026.

54. The Title IX office suspended its investigation at Jane's request due to Jane's personal obligations from March 16, 2026 through April 10, 2026.

55. At the outset of the investigation, Plaintiff was instructed not to speak with anyone about the matter, and he complied with this instruction.

56. Jane, by contrast, spoke openly with co-residents and attending physicians about her allegations, spreading her account throughout the program before any determination was made and biasing program leadership, witnesses, the investigator, and the decision-maker against Plaintiff.

57. The assigned Title IX investigator, Imani Sweeney,[6] collected surveillance video footage showing Plaintiff and Jane walking together to the on-call room, spending approximately twenty minutes inside, and then exiting and walking side by side to the Emergency Department.

58. The footage shows no attempted physical contact by John and no distress or unusual demeanor by Jane.

59. Before the first determination was issued, Plaintiff was provided only still images of the video footage and was denied the opportunity to review the actual evidence, including surveillance footage and the full text messages upon which the investigator and decision-maker relied.

60. Plaintiff was provided a draft investigation report on May 8, 2026 and timely submitted a written response.

61. John was never afforded a live Title IX hearing.

62. John was denied the opportunity to question or cross-examine Jane or any witness.

---

[6] Mr. Sweeney is an employee of the University in its Title IX office.

63. John was denied the opportunity to review the actual evidence relied upon before a finding of responsibility was reached.

64. On July 1, 2026, Defendant's Chief Compliance Officer and Title IX Decision-Maker LaVonne E. Pulliam issued a Written Determination finding Plaintiff responsible for unwelcome conduct (Allegation 1) and sexual assault (Allegation 2) in violation of the Title IX Policy, and imposing the sanction of dismissal from the residency program.

65. The Written Determination credited Jane's account as "consistent" despite material discrepancies.

66. Jane's initial allegation placed the incident at approximately 3:30 a.m. while the video footage established that she and Plaintiff entered the on-call room together at 5:13 a.m.

67. During the investigation, Jane claimed that John attempted to kiss her in the hallway after leaving the on-call room.

68. The decision-maker dismissed the absence of any physical contact in the hallway and elevator footage as non-determinative.

69. The decision-maker disregarded that Jane's own requested witness reported a materially different and more severe account than the allegations Jane ultimately advanced in the investigation.

70. The investigator and decision-maker failed to address that multiple witnesses observed Plaintiff and Jane to be "completely fine" near the end of the shift after she and

John left the call room and that Jane had recently nominated Plaintiff for Resident of the Month, describing him as "professional, kind, and hardworking."

71. The decision-maker characterized Plaintiff's offers of food to Jane and other colleagues as evidence of intimidation, without regard to the cultural context of such offers within Arab and Saudi custom.

72. Defendant's Deputy Title IX Coordinator who signed the formal complaint against Plaintiff, Ms. Marko Koeberer, was initially designated as the recipient and administrator of Plaintiff's appeal, in violation of the Title IX requirement that the appeal decision-maker not be the same person who served as Title IX Coordinator in the matter.

73. On July 15, 2026, Plaintiff timely appealed the Written Determination on the grounds of procedural irregularity, new evidence not reasonably available at the time of the determination, and conflict of interest and bias, requested that the sanction of dismissal be held in abeyance pending resolution, and requested to return to the residency program during the pendency of the remand process as he had been during the pendency of the initial process.

74. John objected to the assignment of Ms. Marko Koeberer as the appeal decision-maker, and Defendants thereafter appointed an outside adjudicator to decide the appeal.

75. On August 5, 2026, the outside adjudicator issued a written decision ("Appeal Decision") sustaining Plaintiff's appeal, concluding that Plaintiff had established

one or more permissible grounds for appeal that materially affected the outcome, and remanding the matter for further investigation.

76. The Appeal Decision found that Defendants committed a procedural deficiency that materially affected the outcome by failing to afford either party the opportunity to inspect and review the actual evidence gathered during the investigation, including the surveillance footage, before the investigation report was completed, and by relying instead on the investigator's summaries of that evidence.

77. The Appeal Decision further found that Defendant committed a procedural deficiency that materially affected the outcome by failing to afford the parties any opportunity to submit written questions to the parties and witnesses before the Written Determination was issued, and by never providing the parties with the final investigation report, notwithstanding that the Written Determination relied almost exclusively on credibility determinations that the parties were never given the opportunity to test.

78. On remand, the Appeal Decision directed Defendant to provide both parties the opportunity to review all evidence gathered in the investigation in its entirety, expressly stating that summaries of the evidence would not satisfy this requirement; to afford the parties ten days to respond to the evidence and to submit written questions or request additional investigation before completion of the investigation report; and, once the investigation report is delivered, to afford the parties the opportunity to submit written questions to the parties and witnesses, with reasonable follow-up.

79. Although the Appeal Decision sustained Plaintiff's appeal on procedural grounds, it declined to provide John with a live hearing, relying on agency commentary in the Federal Register at 85 Fed. Reg. 30446-47.

80. Although the Appeal Decision remanded the Title IX process to the investigation phase, Defendant declined to permit John to return to the residency program as they had during the pendency of the prior investigation.

81. Following the Appeal Decision, John and Defendant exchanged correspondence regarding the procedures proposed for the remand. Defendant confirmed that it would neither provide Plaintiff a live hearing on remand nor return Plaintiff to the residency program pending resolution of the Title IX process, and would instead keep Plaintiff on an involuntary administrative leave for the duration of the remand.

82. Plaintiff, through counsel, objected to the proposed remand process and demanded a live Title IX hearing before an outside decision-maker with no prior involvement in the matter, providing real-time cross-examination of Jane and witnesses; a verbatim recording or transcript of the hearing; and a written determination containing express credibility findings.

83. Defendant refused to provide a live Title IX hearing with real-time cross-examination of Jane and other witnesses.

84. Defendant has decided to keep Plaintiff on administrative leave, over his objection, throughout the remand rather than returning him to the residency program.

85. Defendant did not conduct an individualized safety and risk analysis before removing John from the residency program.

86. Defendant has identified no safety or security concern justifying Plaintiff's removal from the residency program.

87. The only reason Defendant has offered for placing Plaintiff on an involuntary administrative leave is that the remand process "should be completed in the next twenty to thirty days."

88. Defendant has not offered John an opportunity to challenge the removal decision.

89. Plaintiff continued to participate in the residency program for approximately three months during the pendency of the original investigation without incident, and was placed on administrative leave only after issuance of the Written Determination that Defendants' own appeal authority has since found defective and remanded.

90. John now faces a Title IX process that denies him a Title IX hearing and live cross-examination in a proceeding based entirely on credibility determinations and whether John or Jane is to be believed.

91. As a direct result of Defendant's actions, John faces irreparable harm to his reputation, and the effective end of his medical career.

92. John stands to immediately lose his ability to remain in the United States on his J-1 visa and risks deportation.

**COUNT I**
**Gender Discrimination in Violation of Title IX**

93. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

94. Title IX prohibits sexual harassment and sex discrimination in connection with educational programs and activities that receive federal funding. *See* 20 U.S.C. § 1681(a).

95. Defendant is a recipient of federal funding.

96. Upon information and belief, males involved in Defendants' Title IX processes are routinely denied procedural protections of Title IX.

97. Upon information and belief, Defendant has engaged in selective enforcement of its Title IX policies, pursuing and adjudicating the complaint brought by Jane, a female, against Plaintiff, a male respondent, with greater speed and severity than comparable complaints in which the genders of the parties are reversed, and imposing the most severe available sanction against John.

98. The proceeding against Plaintiff has been fraught with procedural irregularities that cast articulable doubt on the accuracy of any outcome to be reached, including the denial of a neutral outside adjudicator for the remand proceeding, the denial of a live hearing, and the denial of any meaningful opportunity to cross-examine Jane or the witnesses involved in this matter.

99. The Title IX process afforded to Plaintiff denied basic requirements of Title IX proceedings, including, but not limited to:

a. A properly trained decision-maker and appeal officer free from conflicts of interest and bias. *See* 34 C.F.R. § 106.45(b)(1)(iii).

b. A live hearing with an opportunity for cross-examination of Jane and other adverse witnesses through an advisor of choice. *See* 34 C.F.R. § 106.45(b)(6)(i).

c. An equal opportunity to inspect, review, and present all evidence directly related to the allegations, including inculpatory and exculpatory evidence and evidence upon which the institution did not intend to rely, so that Plaintiff could meaningfully respond before the conclusion of the investigation. *See* 34 C.F.R. § 106.45(b)(5)(vi); id. § 106.45(b)(1)(ii).

d. That the burden of proof and the burden of gathering evidence sufficient to reach a determination rest on Defendant, not on the Respondent. *See* 34 C.F.R. § 106.45(b)(5)(i).

e. A presumption that Plaintiff was not responsible for the alleged conduct unless and until a determination was reached at the conclusion of a compliant process. *See* 34 C.F.R. § 106.45(b)(1)(iv).

f. That any determination of responsibility must be supported by a fair evaluation of the evidence under the applicable standard of proof. *See* 34 C.F.R. § 106.45(b)(1)(ii); *id.* § 106.45(b)(7)(i).

100. In the initial iteration of the Title IX proceedings at issue, the Decision-Maker credited Jane's account notwithstanding material inconsistencies, including, *inter alia,* her placement of the incident at approximately 3:30 AM when video footage established that she and Plaintiff entered the on-call room together at 5:13 AM and her report of different allegations to her requested witness, while discrediting Plaintiff's consistent denials of any physical contact.

101. Gender bias was a motivating factor in the first proceeding's erroneous outcome as evidenced by, *inter alia*, differential credibility determinations between John and Jane based on identical facts where the only discernable difference is the gender of the parties.

102. The Decision-Maker further construed Plaintiff's culturally-normative offers of food as evidence of intimidation, applied credibility standards more favorably to Jane, a female witness, than to John as the male Respondent, and disregarded exculpatory evidence, including footage showing Jane's ordinary demeanor and her prior nomination of Plaintiff for Resident of the Month.

103. As a direct and proximate result of Defendant's gender-based discrimination, Plaintiff has suffered and will continue to suffer injury, including, without limitation, a wrongful finding of responsibility in the initial Title IX process; the denial of the ability to return to his residency program during the remand of his Title IX case; a Title IX proceeding that is defective in denying John required procedural protections of a live hearing, neutral decisionmaker, and cross examination while the trajectory of his life and career hang in the balance.

104. As a direct and proximate result of Defendant's gender-based discrimination, John has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT II
### Title IX Retaliation

105. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

106. Title IX prohibits sexual harassment and sex discrimination in connection with educational programs and activities that receive federal funding. *See* 20 U.S.C. § 1681(a).

107. Defendant is a recipient of federal funding.

108. John engaged in protected activity under Title IX by (i) participating in the Title IX process; and by (ii) filing an appeal of the Title IX determination against him.

109. Defendant participated in retaliation against John for his protected activity by placing John on involuntary administrative leave from the residency program over John's objection.

110. John's ongoing involuntary removal from the Neurology Residency Program will deprive him of access to educational and other benefits as a resident and student.

111. This action immediately followed John's participation in the Title IX process and his filing of a successful appeal of the determination against him.

112. John's removal would serve to dissuade a reasonable resident from availing himself to the Title IX and Title IX appeal processes available to residents at the Hospital.

113. John is experiencing further materially adverse consequences in relation to Defendant's failure to provide John with a Title IX process that complies with the law, including, but not limited to, reputational harm, significant distraction, and interruption of his residency progress, in addition to the impending loss of his J-1 visa status.

114. As a direct and proximate result of Defendant's retaliatory actions, John has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT III
**Breach of Contract – Title IX Policies**

115. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

116. John and the Hospital entered into a contractual relationship wherein John participated in the residency program in exchange for educational and related services along with a modest stipend.

117. The Title IX Policy was incorporated into the contractual relationship between John and the Hospital.

118. The Title IX Policy governing Defendant's proceedings, University Hospitals Policy NDH-02, expressly incorporates the procedural protections required by the applicable Title IX regulations and represents that those procedures will be followed in any matter meeting the definition of sexual harassment under Title IX. A true and correct copy of the Title IX Policy is attached hereto as Exhibit 1; *see* Exh. 1 § 1.2, at 1.

119. The Hospital breached their contractual obligations pursuant to the Title IX Policy when, inter alia, they: (a) reached a determination of responsibility against John without holding a live hearing; (b) denied Plaintiff any opportunity to cross-examine the Jane or other adverse witnesses; (c) denied Plaintiff a meaningful opportunity to review evidence including relevant surveillance footage and electronic messages and before an initial finding was reached; (d) imposed the sanction of dismissal based on a proceeding that departed from the promised procedures in each of these respects; and (e) violated the presumption of non-

responsibility required under Title IX and requirements to hold an individualized threat assessment prior to imposing an involuntary leave on John during the pendency of the remanded Title IX proceedings in this matter.

120. John performed all duties owed under the contract between himself and the Hospital, by participating in the residency program and abiding by University and Hospital policies, including the Title IX Policy.

121. Every contract in Ohio, including the contractual relationship between John and Defendant, carries an implied covenant of good faith and fair dealing that obligates each party to act honestly and to refrain from conduct that would deprive the other of the benefit of the bargain.

122. The benefit of John's bargain included a Title IX process conducted fairly, in good faith, and in accordance with the procedures Defendant promised.

123. Defendant breached the implied covenant of good faith and fair dealing by conducting a Title IX proceeding against John in bad faith and in a manner that is fundamentally unfair.

124. As a direct and proximate result of Defendant's breach, Plaintiff has suffered and will continue to suffer injury, including, without limitation, a wrongful finding of responsibility in the initial Title IX process; the denial of the ability to return to his residency program during the remand of his Title IX case; a Title IX proceeding that is defective in denying John required procedural protections of a live hearing, neutral decisionmaker, and cross examination while the trajectory of his life and career hang in the balance.

125. As a direct and proximate result of Defendant's conduct John has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT IV**
**National Origin Discrimination in Violation of Title VI**

126. John hereby incorporates all preceding paragraphs as if fully reproduced herein.

127. Title VI of the Civil Rights Act of 1964 provides that no person shall, on the ground of national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d.

128. Defendant, as a recipient of federal financial assistance, is subject to the requirements of Title VI.

129. John is a Saudi Arabian national, and his national origin was a motivating factor in the investigation, adjudication, and sanctioning of the complaint against him.

130. Defendant discriminated against John on the basis of national origin by, *inter alia,* characterizing his culturally-normative offers of food to colleagues as evidence of intimidation and inappropriate conduct, without any consideration of their cultural context, and by evaluating his conduct and demeanor through a lens that failed to account for his national origin and cultural background.

131. As a direct and proximate result of Defendant's national-origin discrimination, John has suffered and will continue to suffer injury, including a wrongful finding of

responsibility in the initial Title IX case and resulting reputational, professional, and other harm compensable in an amount to be determined at trial.

**WHEREFORE**, John respectfully requests that this Court:

(A) Enter injunctive relief against Defendant to refrain from causing John to be removed from his residency program and be excluded from his rotations;

(B) Enter injunctive relief against Defendant to refrain from banning John from accessing the Hospital;

(C) Enter injunctive relief against Defendant to mandate a live hearing in John's Title IX proceedings;

(D) Enter injunctive relief against Defendant to assign an outside, neutral adjudicator to administer the remaining portion of the Title IX proceedings involving John, including, if applicable, any informal resolution process;

(E) Award damages in an amount sufficient to compensate John for the loss of academic progress and performance and reputational damage caused by Defendant's wrongful actions, in an amount to be determined at trial;

(F) Award court costs and other reasonable expenses incurred in maintaining this action; and

(G) Award reasonable attorney fees pursuant to Title IX of the Educational Amendments Act of 1972; and

(H) Award any such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 39.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ Anna E. Bullock*
SUSAN C. STONE (0064445)
KRISTINA W. SUPLER (0080609)
ANNA E. BULLOCK (0100008)
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com; aeb@kjk.com

*Counsel for Plaintiff John Doe*

## VERIFICATION

I, John Doe first being duly sworn, declare as follows:

1. I am the Plaintiff in the present case identified as "John Doe," a Saudi Arabian national, and a student legally present in the United States pursuant to a J-1 visa.

2. I have personal knowledge of my activities, my experiences, and my intentions, including those set forth in the foregoing Verified Complaint, and if called upon to testify I would competently testify as to the matters stated in this Verified Complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct to the best of my knowledge. 28 U.S.C. § 1746.

John Doe
Redacted - Original
Available Upon Request

SUBSCRIBED AND SWORN BEFORE ME THIS 10 DAY OF September 2026




NOTARY PUBLIC

My commission expires: 9-27-2028

Registration No. RE-868948