IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY HOSPITALS CLEVELAND MEDICAL CENTER,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL CASE NO. 1:26-cv-02126<br><br>JUDGE BRIDGET MEEHAN BRENNAN |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING HEARING ON MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff John Doe ("Dr. Doe") submits the following Proposed Findings of Fact and Conclusions of Law pursuant to the Court's directive at the close of the October 7, 2026 hearing on his Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 2].

## I. PROPOSED FINDINGS OF FACT

### A. Dr. Doe Participated in the Residency Program Without Incident for Three and a Half Months While Identical Title IX Allegations Were Pending.

1. Dr. Doe and the complainant, referred to here as "Jane," worked an overnight shift together on February 26, 2026, after which Jane lodged allegations of Title IX sexual misconduct against Dr. Doe. *See* Verified Amended Complaint ("Am. Compl.") ¶ 36 [ECF No. 14]; Answer [ECF No. 45] ¶ 36. Jane did not file a formal Title IX complaint. Am. Compl. ¶ 37; Answer ¶ 37. Defendant's Deputy Title IX Coordinator, Deborah Marko Koeberer, met with Jane on March 3 and filed a formal Title IX complaint on March 4. Am. Compl. ¶¶ 38-39; Answer ¶¶ 38-39.

2. On March 2, 2026, Dr. Preston, the Neurology Program Director, placed Dr. Doe on administrative leave and advised him in writing not to speak to others about the investigation until it concluded. Plaintiff's Hearing Exhibit ("Pl. Hr'g Ex.") 8; Preliminary Injunction Hearing Transcript ("Hr'g Tr."), Oct. 7, 2026, at 35:24-36:8; 81:19-82:7. Jane was not given a similar

instruction and spoke openly. Am. Compl. ¶¶ 55-56. The March 5, 2026 notice of investigation cites only policy NDH-02, not NDH-06. Pl. Hr'g Ex. 9; Hr'g Tr. at 201:18-25; 209:2-4; 210:9-16. NDH-02 does not address whether a live Title IX hearing is provided. *See* Pl. Hr'g Ex. 4.

3. On March 13, 2026, Dr. Preston returned Dr. Doe to the program and advised Dr. Doe that his training would not need to be extended. Pl. Hr'g Ex. 10; Hr'g Tr. at 56:1-19; 230:3-23. Dr. Doe's schedule was modified so that he and Jane would not overlap. Hr'g Tr. at 202:10-203:2.

4. Dr. Doe then participated in the program for approximately three and a half months while the investigation remained pending. *Id.* at 41:21-23. He treated patients and had no contact with Jane. *Id.* at 41:17-20; 41:24-42:1. Dr. Doe attended class, collaborated, and learned. *Id.* at 42:6-13. No report alleged he harmed anyone or violated the no-contact order. *Id.* at 42:14-20; 42:24-43:1.

5. Mr. Sweeney, Defendant's Title IX investigator, received no complaint about Dr. Doe from any source, including visitors, apart from the previously filed Title IX complaint itself. *Id.* at 212:10-16. He has no knowledge of any conduct by Dr. Doe harming a patient or posing a safety risk to others, and he requested no additional restrictions on Dr. Doe. *Id.* at 203:9-11; 207:9-20.

### B. Dr. Doe Prevailed on Appeal, and the Process Afforded to Him Was Recognized as Deficient, but the Removal Sanction Remains.

6. A written Title IX decision on July 1, 2026 found Dr. Doe responsible for violations of UH's Title IX policy and dismissed him from the program. *Id.* at 43:7-10; 69:24-70:2; 205:20-23.

7. Dr. Doe appealed. *Id.* at 43:11-14. On August 5, 2026, an outside appeal decision maker sustained the appeal, noting several deficiencies in the process, and remanded the matter for investigation. *Id.* at 43:15-16; 204:21-23; 205:17-19. Instead of being returned to the *status quo* prior to the finding, Dr. Doe was placed on an indefinite administrative leave. *Id.* at 27:16-19.

8. Mr. Sweeney agreed that Dr. Doe's removal "was imposed as a result of a finding of responsibility[,]" Dr. Doe was not reinstated after the remand, and "the functional equivalent of

that sanction still remains in effect." *Id.* at 205:5-9; 205:24-206:5. Yet, Mr. Sweeney agreed, until the grievance process concludes, that Dr. Doe is presumed not responsible. *Id.* at 202:2-5.

9. Joseph Vincent, an expert in Title IX compliance, testified that "there's nothing that justifies [Dr. Doe's] removal," and that Defendant "effectuated the discipline even before the appeal window closed." *Id.* at 170:7-10; 178:1-8.

10. Jane has graduated and is no longer in the neurology residency program. *Id.* at 206:6-11.

### C. No Title IX Individualized Safety or Risk Determination Was Done.

11. Mr. Vincent testified that a Title IX emergency removal from an education program requires an individualized risk that "has to be imminent and articulable," and that "the Title IX allegation itself can't form the full basis for the risk assessment." Hr'g Tr. at 168:10-20. A removed student is entitled to prompt secondary review, "[e]ffectively an appeal." *Id.* at 169:3-10. Dr. Doe received none of this process. *Id.* at 169:13-16.

12. Mr. Sweeney never conducted an individualized safety risk assessment analysis of Dr. Doe. Hr'g Tr. at 220:18-20. No one spoke with Dr. Doe about a safety assessment. *Id.* at 44:6-11. Dr. Doe objected to his exclusion, but he was not permitted to return. *Id.* at 44:12-18; 45:2-3.

13. Defendant admits that it placed Dr. Doe on leave "due to the extreme allegations that could lead to harm to patients, visitors, and employees." Answer ¶ 80. Defendant identifies the Title IX allegations themselves as the sole basis for removal. *See id*; *see also* Hr'g Tr. at 212:10-16.

### D. Defendant's Process Is Deficient, Denying Dr. Doe a Live Hearing.

14. The March 5, 2026 notice of investigation cites policy NDH-02 and makes no reference to policy NDH-06. Pl. Hr'g Ex. 9; Hr'g Tr. at 201:18-25; 209:2-4; 210:9-16.

15. Mr. Sweeney worked at Case Western Reserve University (the "University") before joining Defendant in March 2025, where the Title IX process included a live hearing with advisor-led

cross-examination, for students, faculty, and staff alike. *Id.* at 197:22-198:12. He testified that "[t]he biggest difference is the live hearing" between the two institutions. *Id.* at 219:9-10.

16. Mr. Sweeney told Jane at the outset that there would be a live hearing. He conceded it was "a mistake on [his] part," because "at UH, we don't do live hearings." *Id.* at 226:16-19. He never raised the subject with Dr. Doe, who raised it himself. *Id.* at 219:19-220:11; 221:4-11.

17. Policy NDH-06, the only policy identified in this record that denies a live hearing, bears an effective date of July 2026. Pl. Hr'g Ex. 1; Hr'g Tr. at 208:10-13. Dr. Doe's Title IX matter began in early March 2026. *Id.* at 208:14-16. Mr. Sweeney confirmed he applied NDH-06 from the outset, before July 1, 2026, and that even in March 2026 he was "implementing the directives of NDH-06" before it was a published policy. *Id.* at 225:6-10.

18. NDH-06 was not published in Defendant's internal policy system until July 2026, and the Court confirmed Dr. Doe could not have seen NDH-06 until it was published in July 2026. *Id.* at 211:6-10. The first communication to Dr. Doe concerning NDH-06 was Mr. Sweeney's email of September 10, 2026. Pl. Hr'g Ex. 2; Hr'g Tr. at 211:22-212:5.

19. Dr. Doe's ability to test credibility is limited to the submission of written questions. *Id.* at 214:24-215:2. His advisor cannot question witnesses directly or live. *Id.* at 215:24-216:17. Mr. Sweeney agreed there is no way to know whether a witness consulted counsel or another person, or whether someone other than the witness supplied a written answer. *Id.* at 216:18-25.

20. Dr. Doe testified that the appeal determination "mentioned clearly this case is completely based on [a] credibility determination." *Id.* at 73:8-11.

21. Dr. Doe requested an outside decision maker and was refused. *Id.* at 45:24-46:3; 212:17-19. Mr. Sweeney confirmed he is "not aware of any policy provision that would prohibit University Hospitals from utilizing an outside decision maker for this grievance process." *Id.* at 213:4-6;

213:24-214:3. Mr. Vincent testified that Defendant should "pick someone externally, like they did with the appeal decision maker," as peer institutions routinely do. *Id.* at 165:17-19; 166:2-20.

22. Because the live-hearing issue was raised and adjudicated on appeal, it is foreclosed going forward. Mr. Vincent testified that because "the original decision maker addressed and ruled on the notion of the live hearing," Dr. Doe cannot raise it in another appeal. *Id.* at 164:24-165:2. Dr. Doe testified to the same understanding. *Id.* at 76:1-4; 77:1-6.

### E. The University Hospitals Neurology Residency Program Is a Hybrid Employment and Educational Program.

23. Dr. Doe, a Saudi Arabian citizen, is an international medical resident lawfully present in the United States on a J-1 visa. *See* Hr'g Tr. at 19:20; Am. Compl. ¶ 28. He is enrolled in a four-year neurology residency program operated by Defendant through the University. Hr'g Tr. at 22:13-14; 24:1-2. The program is accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), and Defendant receives federal financial assistance. Answer ¶¶ 11-12, 15.

24. The residency program is educational. Dr. Doe must attend a mandatory daily noon conference, which he described as "a class, like a lecture" from which examination material is drawn; a mandatory Friday lecture; and three required third-year courses, including a neuroscience course on the University's main campus. Hr'g Tr. at 24:6-21; 25:1-12. He must pass internal, national, and oral examinations to advance, and his rotations are sequenced under an ACGME curriculum. *Id.* at 25:13-18; 26:17-27:7; 28:1-5. He conducts research with University faculty and students and holds a University email address and identification card. *Id.* at 28:8-14; 29:23-30:1.

25. Dr. Doe "cannot make any independent decision without the approval of [his] attending," his chart notes must be co-signed, and the attending performs the billing. *Id.* at 26:6-14; 79:6-10. Senior residents, including the Title IX complainant, also instruct him. *Id.* at 79:11-21.

26. Mr. Vincent testified that Dr. Doe occupies a "mixed classification" as a "student employee" in which his "primary engagement to the institution is academic[.]" *Id.* at 147:12-21; 156:16-24; 158:9-17.

27. Mr. Vincent described the arrangement under which Dr. Doe learned and worked as "one of the most intertwined" he has seen, and testified that "[h]is authority figures at the medical school are the same as his authority figures in the residency program." *Id.* at 193:14-194:17.

28. Dr. Doe's Form DS-2019, completed by Defendant, identifies the site of activity as the University and University Hospitals Cleveland. Pl. Hr'g Ex. 17 at 14-15; Hr'g Tr. at 32:14-33:4.

### F. Dr. Doe Is Losing Training, Standing, and Status Every Day He Remains Excluded.

29. Since July 1, 2026, Dr. Doe has had no access to the hospital, to conferences, to the University for research, to patients, or to faculty. *Id.* at 43:20-44:5. He has missed rotations and noon conferences, his research is "all suspended," and he is now more than three months off cycle, losing clinical opportunities, education, and skills. *Id.* at 44:19-24; 46:4-17; 47:3-5. Dr. Doe testified that he will be permanently harmed if he does not return to training. *Id.* at 55:4-6.

30. Dr. Doe testified about the sequenced and scheduled nature of his clinical training, stating "[e]very day is critical...I need to get back tomorrow[.]" *Id.* at 54:24-55:3. Even so, Dr. Doe testified that "no one has identified when this process will come to a firm end." *Id.* at 45:10-12. The fellowship application cycle opens in December, and Dr. Doe cannot realistically apply while excluded from the program. *Id.* at 30:20-31:5; 46:8-12.

31. Dr. Doe has applied to approximately forty residency programs and either received rejections or no response. *Id.* at 48:5-21; Pl. Hr'g Exs. 19-25. There is no formal transfer mechanism similar to the "match" system for new applicants. *See id.* at 53:10-16. Mr. Vincent also

testified that a disclosable Title IX finding renders a candidate "almost completely uncompetitive" for any rare open spots, compounded by international medical graduate status. *Id.* at 174:2-25.

32. Dr. Doe's Form DS-2019 bears an end date of June 30, 2028, roughly nine days after his residency is scheduled to conclude; its expiration terminates his lawful status, and the visas of his spouse and children depend on his. Pl. Hr'g Ex. 17 at 14-15; Hr'g Tr. at 33:18-35:3. Tabatha Martemus, Defendant's Training Program Liaison, testified that extension is discretionary and that non-extension means the resident "would have to leave the country." *Id.* at 132:14-18; 133:1-2; 134:3-25. No one can guarantee an extension. *Id.* at 133:3-5. Ms. Martemus testified that the sponsor holds the J-1 sponsorship valid "until a decision" on the Title IX matter. *Id.* at 130:1-7.

33. Rishi Oza, an immigration expert, testified that prolonged administrative leave creates a risk that the Department of Homeland Security will conclude that Dr. Doe is not maintaining valid J-1 status. *Id.* at 85:19-21; 86:17-18; 98:23-99:12; 103:16-23. A termination carries no grace period and unlawful presence accrues immediately. *Id.* at 103:9-15. The status conclusion is not the sponsor's alone to make. *Id.* at 108:25-109:5.

## II. PROPOSED CONCLUSIONS OF LAW

### A. Standard of Review.

34. The same standard governs a temporary restraining order and a preliminary injunction. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). The factors are "interrelated considerations that must be balanced together," and "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). A likelihood of success on any one claim suffices. *See Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 781 (6th Cir. 2003).

### B. Dr. Doe Is Entitled to the Title IX Protections Afforded Students.

35. The appeal determination denied a hearing on the premise that a medical center operating a residency is not a "post-secondary institution" under 34 C.F.R. § 106.45(b)(6)(i) (2020), relying on Federal Register commentary. However, this language in the preamble to the Title IX regulations is not a categorical exemption from Title IX hearings and application of the regulations to a medical resident requires a factual determination as to whether the residency program is educational in nature. Moreover, after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412-13 (2024), this Court exercises independent judgment in construing the statute and owes no deference to agency interpretation. *See United States v. Bricker*, 135 F.4th 427, 440 (6th Cir. 2025).

36. "[E]very circuit to address the question agrees that medical residents receive the due process protections of students." *Mares v. Miami Valley Hosp.*, 96 F.4th 945, 952 (6th Cir. 2024); *see also Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 558 (3d Cir. 2017). Findings 23 through 28 establish the program's educational character. *See Castro v. Yale Univ.,* 518 F. Supp. 3d 593, 604 (D. Conn. 2021) (holding an academic medical center to be an academic program subject to Title IX requirements where the university and hospital shared staff and faculty, and the program received federal funding as a teaching hospital and prepared residents for board certification). The residency program's dual character does not weaken Dr. Doe's entitlement to those due process protections because his engagement with the institution is primarily educational. Findings ¶¶ 24-25, 28.

37. Dr. Doe faces a Title IX charge turning entirely on contested credibility, the category demanding the most process. *Mares*, 96 F.4th at 954 n.4.

### C. Dr. Doe Has Shown a Likelihood of Success on the Merits of His Claims.

#### i. *Dr. Doe Is Likely to Prevail on His Title IX Gender Discrimination Claim.*

38. A Title IX discrimination claim based on erroneous outcome requires facts that "cast some articulable doubt" on the accuracy of the outcome and a "particularized causal connection between the flawed outcome and gender bias." *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018).

39. Articulable doubt is present here. Where a university denies cross-examination in a case turning on credibility, the respondent "has pled facts sufficient to cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome." *Id*. Credibility is the whole of this case: Dr. Doe himself testified that the appeal determination found the matter "completely based on credibility," and he can test that credibility only through written questions his advisor cannot pose live. Findings ¶¶ 19, 20. Dr. Doe was denied a hearing and cross-examination in the first instance and is denied both on remand. Findings ¶¶ 14, 16, 19. Defendant's own appeal authority found the completed process defective. Findings ¶¶ 7, 21. The regulations incorporated into Defendant's policy require an equal opportunity to inspect all evidence related to the allegations, 34 C.F.R. § 106.45(b)(5)(vi) (2020), and a live hearing with advisor-conducted cross-examination. *Id.* § 106.45(b)(6).

40. Defendant also refused Dr. Doe's request for a neutral decision maker from outside the institution, though no policy forbids one. Findings ¶ 21. It applied NDH-06 from March 2026 forward, months before that policy took effect or was published. Findings ¶¶ 17-18. Because the live-hearing issue was raised and resolved on appeal, it is foreclosed as moot in a future appeal. Findings ¶ 22.

41. "[P]atterns of decision-making" in an institution's cases can supply the connection between outcome and sex. *Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020). *Baum* treats asymmetric credibility assessment along gender lines as probative of bias. 903 F.3d at 586. Here,

Defendant's investigator volunteered to the female complainant information about the availability of a live hearing that he never gave the male respondent. Findings ¶ 16. Dr. Doe, but not Jane, was advised in writing not to speak to others about the investigation. Findings ¶ 2.

**ii. *Dr. Doe Already Suffers From Retaliation.***

42. A prima facie case requires protected activity, knowledge, an adverse school-related action, and causation. *Porter v. Sergent*, No. 23-5944, 2024 U.S. App. LEXIS 27681, at *9 (6th Cir. Oct. 29, 2024). An action is adverse if it "would dissuade a reasonable person from engaging in the protected activity," a standard that "is not onerous." *Doe v. Univ. of Kentucky*, 111 F.4th 705, 716 (6th Cir. 2024).

43. Dr. Doe engaged in protected activity by participating in the Title IX process and by appealing. Exclusion from an accredited training program, with the unrecoverable loss of instruction and clinical experience, is adverse and school-related. Temporal proximity can establish causation. *See Univ. of Kentucky*, 111 F.4th at 716 (noting Title IX retaliation borrows from Title VII); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Dr. Doe participated in the program for three and a half months while these same allegations were pending. He was removed only upon the determination, and placed on leave only after he appealed and prevailed. Findings ¶¶ 4, 6-8.

**iii. *Dr. Doe Is Likely to Prevail on His Breach of Contract Claim.***

44. Under Ohio law the relationship between a student and a private institution is contractual, and the institution's policies form part of that contract. *Marquette v. Ohio Univ.*, Ct. of Cl. No. 2024-00676AD, 2025-Ohio-3218, ¶ 14. A student must show a violated contractual term or a clear abuse of discretion in enforcement of a policy. *Cook v. Kudlacz*, 2012-Ohio-2999, ¶ 21 (7th Dist.).

Ambiguity is construed against the drafter. *Clifton Steel Co. v. Trinity Equip. Co.*, 2018-Ohio-2186, ¶ 18 (8th Dist.).

45. NDH-02 governed this proceeding and was cited in the notice of investigation. Findings ¶ 2. Defendant breached it by reaching a determination without a live hearing required by Title IX, by denying Dr. Doe any opportunity to question witnesses or to meaningfully review the evidence before a finding, and by dismissing him. Defendant separately breached the presumption of non-responsibility that NDH-02 and 34 C.F.R. § 106.45(b)(1)(iv) (2020) require, a presumption its own investigator conceded applies even as the dismissal sanction remains in force. Findings ¶ 8.

46. Defendant applied NDH-06 to Dr. Doe from March 2026, months before it took effect and was published in July 2026, and did not communicate it to him until September 10, 2026. Findings ¶¶ 2, 17-18. The retroactive application of NDH-06 is an independent breach and a clear abuse of discretion under *Cook*. 2012-Ohio-2999, ¶ 21 (7th Dist.); *see also Doe v. W. New Eng. Univ.*, 228 F. Supp. 3d 154, 170 (D. Mass. 2016) (denying a motion to dismiss a breach-of-contract claim where a defendant university attempted to retroactively apply a Title IX policy that was not in existence at the time of the conduct alleged).

**iv. *Dr. Doe Is Likely to Prevail on His Title VI National Origin Discrimination Claim.***

47. A Title VI claim requires that the program receive federal financial assistance, a nexus between the program and the discriminatory conduct, and intentional discrimination. *D.J. Miller & Assocs. v. Ohio Dep't of Admin. Servs.*, 115 F. Supp. 2d 872, 878 (S.D. Ohio 2000); 42 U.S.C. § 2000d.

48. Defendant admits it receives federal financial assistance. Findings ¶ 23. Intentional discrimination is supported by the initial adjudicator's treatment of Dr. Doe's offers of food, extended to male and female colleagues alike, as evidence of intimidation supporting a finding

against Dr. Doe. This treatment ignores the cultural context in which such offers are ordinary generosity. Credibility was assessed against a cultural practice operating as a proxy for national origin, and that assessment was a determining factor in the initial Title IX outcome and sanctions against Dr. Doe. *See D.J. Miller*, 115 F. Supp. 2d at 878.

### D. Dr. Doe Will Suffer Irreparable Harm Absent an Injunction.

49. An irreparable injury is one that "cannot be undone through monetary remedies." *Romantics v. Activision Publ'g, Inc.*, 532 F. Supp. 2d 884, 890 (E.D. Mich. 2008). The harm must be "actual and imminent," not "remote or speculative." *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 680 (E.D. Mich. 1995), *aff'd*, 91 F.3d 143 (6th Cir. 1996).

50. Dr. Doe's educational loss is occurring now and is not recoverable. Dr. Doe has been excluded from an accredited, sequenced four-year program since July 1, 2026. He has missed rotations and conferences, his research is suspended, and he is more than three months off cycle. Findings ¶ 29. That is not a prediction but a continuing loss to which each day adds. Lost educational opportunities and the inability to pursue a vocation are "sufficient to establish the irreparable injury to warrant preliminary injunctive relief." *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666, at *80 (S.D. Ohio Aug. 27, 2019) (finding irreparable harm likely and granting an injunction where a medical student was denied disability accommodations to take an exam necessary for graduation and timely application for his residency match program).

51. Dr. Doe's continued salary does not remedy the loss. The irreparable injury is the deprivation of training, not wages. Findings ¶¶ 29-31. A money judgment entered after this residency has passed him by cannot restore him to his class's schedule. *Romantics*, 532 F. Supp. 2d at 890.

52. The structure of medical training makes the loss compound day by day, and a delay cannot be recovered. Findings ¶ 30. The fellowship cycle opens in December and Dr. Doe cannot realistically compete while excluded. Findings ¶ 30. Transfer is no substitute: forty applications have produced rejections or silence, and no program has identified an opening. Findings ¶ 31.

53. The denial of a live hearing is itself an injury that no later judgment can remedy. Because the issue was adjudicated on appeal, it is foreclosed on any subsequent appeal. Findings ¶ 22. If the remand proceeds without a hearing, the remedy ceases to exist. A recipient may not impose a sanction before the process concludes. *Doe v. Univ. of Michigan*, 448 F. Supp. 3d 715, 733 (E.D. Mich. 2020). Courts enjoin such scenarios without process. *See Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio 2016) (enjoining suspension against a Title IX respondent based on a deficient process).

54. The exclusion is an unlawful sanction being imposed now, not a potential future outcome. Dr. Doe prevailed on appeal, the determination that produced his dismissal has been vacated, and he is presumed not responsible. Findings ¶¶ 7-9. Defendant's own investigator conceded that the functional equivalent of the dismissal sanction remains in effect. Findings ¶ 8.

55. No individualized safety determination supports the exclusion. Under 34 C.F.R. § 106.44(c) (2020), a student respondent may be removed only upon an individualized safety and risk analysis finding an immediate threat to safety, with notice and an opportunity to challenge the removal. Defendant performed no analysis and afforded no opportunity to challenge. Findings ¶¶ 11-12. It admits the leave rests only on "the extreme allegations." Findings ¶ 13. Defendant's reliance on § 106.44(d), which governs a "non-student employee respondent," fails for the reasons stated in Part II(B).

56. The record forecloses any contention that the exclusion is protective rather than punitive: Dr. Doe worked in the program without incident, complaint, or discipline for three and a half months while these same allegations were pending. Findings ¶¶ 4-5.

57. The threat to Dr. Doe's lawful status aggravates the harm. His sponsorship document expires June 30, 2028, roughly nine days after his residency is scheduled to end, and Defendant's liaison testified that extension is discretionary and non-extension means departure from the country. Findings ¶ 32. The assurance Defendant invokes, that the sponsor will hold sponsorship valid, is expressly conditioned on the absence of a decision and expires when the remand produces one. *Id.* Mr. Oza testified that the status determination does not belong to the sponsor alone. Findings ¶ 33. Loss of lawful status and removal cannot be undone by a later judgment. *See Cruz v. Mullin,* 833 F. Supp. 3d 785, 795 (E.D. Mich. 2026). Even apart from immigration consequences, Conclusions 50 through 56 establish irreparable harm in educational loss.

58. Reputational injury supplies a further ground. "[M]atters concerning reputation can constitute irreparable harm for which there is no adequate remedy at law." *DK Prods. v. Miller*, 2009-Ohio-436, ¶ 13 (12th Dist.). Dr. Doe's indefinite absence, following a vacated determination, conveys to his colleagues and other programs to which he applies that he was found responsible at the conclusion of the process or judged to be dangerous. Neither is true.

### E. Injunctive Relief Would Not Cause Substantial Harm to Others.

59. The relief sought restores the arrangement under which the parties operated without incident for three and a half months. Findings ¶¶ 3-5. Returning him preserves the *status quo* rather than disturbing it. *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 1834 (1981). Defendant retains every supportive and protective measure its policy permits. An institution's ability to impose interim measures mitigates any harm from injunctive relief. *Sellers v. Univ. of*

*Rio Grande*, 838 F. Supp. 2d 677, 688 (S.D. Ohio 2012) (permitting nursing student's return to program under temporary restraining order, subject to limitations on the student's activities).

60. The complainant cannot be harmed; she has graduated and no longer works at the hospital, as Defendant admits. Findings ¶ 10. Nor does Defendant suffer cognizable harm from being required to afford a live hearing before a neutral decision maker: it concedes that no policy prohibits an outside decision maker. Findings ¶¶ 15, 21.

### F. Granting Injunctive Relief Serves the Public Interest.

61. The public interest lies in faithful enforcement of Title IX and Title VI. A civil rights plaintiff "does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest importance." *City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986). Furthermore, there is a public interest in continuity of care for patients of Dr. Doe. *See Planned Parenthood Great Nw., Haw., Alaska, Ind., & Ky., Inc. v. Cameron,* 599 F. Supp. 3d 497, 509 (W.D. Ky. 2022) (noting "public policy supports an injunction when there would be a disruption to medical services or a patient's continuity of care[.]").

### G. Security Should Be Waived or Set in a Nominal Amount.

62. Rule 65(c) commits the amount of security, including whether to require any at all, to the Court's discretion. *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013). The relief sought imposes no monetary exposure on Defendant. In *Doe v. University of Cincinnati* the court set bond at one dollar. 223 F. Supp. 3d at 713.

63. Accordingly, Dr. Doe respectfully requests that the Court enjoin Defendant from excluding him from the neurology residency program pending the conclusion of his Title IX process, order that the process afford a live hearing with advisor-conducted cross-examination before a neutral decision maker from outside the institution, and waive security or set it in a nominal amount.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ Anna E. Bullock*
SUSAN C. STONE (0064445)
KRISTINA W. SUPLER (0080609)
ANNA E. BULLOCK (0100008)
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com; aeb@kjk.com

*Counsel for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2026, I caused a copy of the foregoing *Plaintiff's Proposed Findings of Fact and Conclusions of Law to* be electronically filed with the Clerk of the United States District Court for the Northern District of Ohio using the CM/ECF system, which will send notification of such filing to all parties that have appeared in this action.

*/s/ Anna E. Bullock*
ANNA E. BULLOCK (0100008)